IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RIVIANA FOODS, INC., and Interested Subrogated Underwriters, Plaintiffs, v. JACOBSON WAREHOUSE, INC. as Successor to Arnold Logistics, LLC, doing business as XPO Logistics-Supply Chain, Defendant. | Case No. 18 C 6550 |
| ------------------------------ | |
| GXO WAREHOUSE COMPANY, INC., Third-Party Plaintiff, v. EXETER 25810 S. RIDGELAND, LLC, Third-Party Defendant/ Plaintiff, v. JTM ELECTRICAL CONTRACTORS, INC., and MCNELLY SERVICES, INC. Third-Party Defendants. | Chicago, Illinois<br>July 25, 2024<br>11:14 a.m. |

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | CARUSO GLYNN, LLC<br>BY: MR. LAWRENCE CARUSO GLYNN<br>Suite 201<br>242-03 Northern Blvd.<br>Little Neck, New York 11362 |
| For the Defendant/ Third-Party Plaintiff Jacobson Warehouse/ GXO Warehouse: | THOMPSON COBURN LLP<br>BY: MR. LAWRENCE C. FRIEDMAN<br>One Us Bank Plaza<br>St. Louis, Missouri 63101 |

APPEARANCES: (Cont'd)

For Third-Party Defendant/ Third-Party Plaintiff Exeter: MR. JONATHAN FEINSTEIN
(No Appearance on File)

For the Third-Party Defendant JTM Electrical Contractors:
WOLF & LAUDICINA, LTD.
BY: MR. STEVEN C. WOLF
25 E. Washington Street
Suite 801
Chicago, Illinois 60602

For the Third-Party Defendant McNelly Services, Inc.: ESP KREUZER CORES & MCLAUGHLIN,LLP
BY: MR. JEFFREY S. BARGER
400 South County Farm Road
Suite 200
Wheaton, Illinois 60187

Also Present: MR. RICHARD VALENTINO
Senior Vice President General Counsel GXO

Court Reporter: KATHLEEN M. FENNELL, CSR, RMR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 2328A
Chicago, Illinois 60604
Telephone: (312) 435-5569
Kathleen_Fennell@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: The United States District Court for the Northern District of Illinois is now in session, the Honorable Martha M. Pacold presiding.

11:14:05 18 C 6550, Ravinia Foods vs. Jacobson Warehouse.

If you can state your name for the record, we'll start with plaintiff's counsel.

MR. GLYNN: Good morning, Your Honor. Lawrence Glynn, Caruso Glynn, LLC., Little Neck, New York, for the 11:14:18 plaintiff.

MR. FRIEDMAN: Good morning, Your Honor. Lawrence Friedman, Thompson Coburn, representing the defendant and third-party plaintiff, GXO Warehouse formerly known as Jacobson Warehouse.

11:14:33 THE COURT: Good morning.

Is there anyone else who would like to enter an appearance?

MR. VALENTINO: Richard Valentino, senior vice president general counsel for GXO.

11:14:51 MR. FEINSTEIN: Good morning, Your Honor. Jonathan Feinstein on behalf of Exeter, E-X-E-T-E-R, 25810 South Ridgeland, LLC.

MR. BARGER: Jeff Barger, B-A-R-G-E-R, for McNelly Services.

11:15:05 MR. WOLF: And Steve Wolf on behalf of JTM, Your

Honor.

THE COURT: Okay. Good morning again everybody. Thank you for being here, and we're here for arguments on the summary judgment motions.

11:15:21 There are two motions. One is docket 186. That's Riviana's motion for summary judgment, and then the other motion is docket 204. That's GXO's motion for summary judgment, or cross-motion for summary judgment.

So basically we have cross-motions from Riviana and GXO. 11:15:54

Okay. Have the parties had a chance at all to talk about what order you'd like to go in or just the format of today?

MR. GLYNN: We didn't discuss that, Your Honor.

11:16:12 MR. FRIEDMAN: We did not, Judge.

THE COURT: All right. Any thoughts on how to structure today's hearing? I mean --

MR. GLYNN: We could do it a few different ways, Your Honor. Whatever Your Honor prefers. I could -- I guess my 11:16:26 motion was the first one. I could start off with a brief statement and see if Your Honor has any specific questions that you need clarification on, or if you want to just direct questions generally to us. I'm not sure.

THE COURT: So I think it would be helpful if you 11:16:42 could each present some argument just so that it can help me

focus on the right issues.

MR. GLYNN: Sure.

THE COURT: And I can also just jump in if I do have questions at any point, or if I'm not following something, I may stop you and just ask you to repeat it or point to the exact language or exhibit that you're referring to.

In terms of who goes first, I mean, they're cross-motions. I'm not sure it totally matters, but any views on that?

11:16:58

11:17:16

MR. FRIEDMAN: Judge, I was going to say the same thing as Mr. Glynn. If the Court has a preference, otherwise I know -- don't want to have an impasse here. I mean, it makes just as much sense for me to go first. I don't mind if Mr. Glynn goes first. Whatever the Court thinks would be helpful.

11:17:32

THE COURT: Okay. Why don't we just have Mr. Glynn go first then.

MR. GLYNN: Thank you, Your Honor.

So I'm sure Your Honor is familiar with the background of the case. It's a fire loss at a warehouse in Monee, Illinois. Riviana's cargo was stored at this warehouse which was operated by the successor or predecessor, I should say, to GXO. A fire occurred on June 12, 2017, and Riviana's products were destroyed. And it was pasta products.

11:17:44

When this case came across my desk six years ago now

11:18:09

in April of 2018, the first thing I looked at was the Material Handling Service Agreement. That's the governing driving agreement behind this whole case and the motions and cross-motions, and I took a look at that, and I said this is a very tough -- this is a very tough contract, and it's tough for GXO. I looked at this very hard.

I hadn't really -- you know, very rarely have seen such a strong contract that really protected Riviana and really put -- transferred all risk, all risk of loss undeniably to GXO.

So I guess I'm coming at this motion for summary judgment from the -- this -- really, the only thing that could possibly be in question right now would be the damages, but as far as liability, we don't see how any of these specific sections that we describe in our motion and in our opposition to GXO's motion, specifically starting with, you know, the obvious is Section 2.6(d) of the agreement.

That's -- in a nutshell, and we can parse the language, we can -- it's already been briefed extensively. 2.6(d), by any rational reading, makes GXO liable for just about everything. Breach of contract, willful acts, negligence, you name it, they're liable for it. And in this instance, the breach is very simple.

GXO runs a warehouse. Riviana has cargo. Riviana pays GXO to store its cargo, to handle its cargo. It's

delivered to GXO in good order and condition. GXO is contractually obligated to return the cargo to Riviana or Riviana's customers in that same good order and condition. That's it.

11:20:20 If they fail to do that, which they did here, they have now breached the contract. 2.6(d) explicitly makes them liable for their conduct. In this case, their conduct is breaching the contract.

Breaching the contract is a form of conduct, and 11:20:38 2.6(d) makes GXO undeniably liable for everything except consequential damages. So any claims against Riviana, GXO doesn't have to pay for those. That's all for Riviana. They're liable just to Riviana for everything except consequential damages.

11:20:59 If 2.6(d) wasn't clear enough on its face, then I think the extremely broad indemnification language in Section 4.1 certainly drives the point home. GXO under Section 4.1 of the agreement must indemnify Riviana for everything, including costs and attorneys' fees. And, again, 11:21:28 not third-party claims, just Riviana's costs, Riviana's losses.

Here the loss was the pasta and the value of that pasta, those pasta products, GXO is responsible for the value of that -- of that product. If they can't return the product 11:21:47 in the same good order and condition before the fire, they

were responsible for returning the pasta in that same good order and condition immediately before the fire. Otherwise, they were responsible for the monetary equivalent of that cargo immediately before the fire.

So GXO wants to use the force majeure clause as another, you know, get out of jail free. Their interpretation of the clause defies all logic and reason. It's anything but that.

The force majeure clause dictates what will happen between the parties after the fire, after the force majeure event. What happens? Okay, well, GXO doesn't have to -- they don't have to store any more of the cargo, but they do have to move it, to the extent that they can save it, at their own expense, and Riviana no longer has to pay for them to store the cargo. So that's what the force majeure clause says.

It says, look, this basically terminates the agreement. It says nothing about, oh, and by the way, you know, GXO, you're off the hook if, you know, $2.1 million in cargo goes up in smoke. That's not what the force majeure clause says.

And then finally, as if this contract wasn't already strong enough in favor of protecting Riviana and against GXO, in Section 2.11, which clearly states that GXO was required to provide warehouseman's coverage -- not commercial liability insurance -- warehouseman's coverage, naming Riviana as an

additional insured.

GXO admits they had a warehouseman's policy and they admit that Riviana was named as an additional insured. So the question is why didn't Riviana's insurer, whoever that warehouseman's insurer was, why didn't they foot the tab? Why didn't they pay out the $2.2 million? Why did Riviana have to go to its own insurers when they were covered under 2.11?

So we really feel very strongly that we have the clear breaches of all three sections, 2.6(d), Section 4.1, which is the indemnification clause, and Section 2.11, where GXO was required to provide warehouseman's coverage, admits that it had, admits that warehouseman's coverage was named -- I'm sorry -- that Riviana was named as an additional insured under the warehouseman's policy, but yet they're not responsible to pay. The basis of their argument on that, I'm lost.

So that's pretty much plaintiff's position as to where we stand.

THE COURT: Okay. I know you -- so one of your points is that their obligation is to store the -- or to return the cargo to Riviana in the same condition, same good order and condition.

Is that based on a provision of the contract, or is that based on something else? So I guess I'm asking is there some express provision in the contract, besides the ones

you've already identified, that specifies that obligation or any other affirmative or specific obligations, or are you relying more on the nature of the contract, which was for warehouse storage or services?

I mean, I did see, like, 2.6(a). That was something.

MR. GLYNN: That, honestly, Your Honor, that was a question I was not prepared to hear. My understanding is that it's, you know, a warehouseman, such as GXO is, you know, is required to return the cargo in the same condition as it was received. That's pretty much a *prima facie* case, albeit under a bailment theory, which we understand that bailment is no longer a part of the case, but we believe that the contract basically spells out the theory of bailment.

So I think we could look at 2.8 -- 2.1(a) and infer from that an obligation to return it. I mean, I don't see anything in the contract that says, oh, you can give it back to us in any other condition, and I think 2.6(d), you know, makes it clear that they're -- you know, they're liable.

THE COURT: Okay.

MR. GLYNN: Yeah, they're liable for, you know -- you know, they're liable for any losses or damages. Arnold shall be responsible for any losses or damages incurred by Riviana. I think, I mean, implicit in that is you're liable for giving us the cargo back in the same good order and condition, for what other losses really would there be? You know, including,

but not limited to, those losses and damages, I'm reading from 2.6(d), where damages caused by or as a result of Arnold's improper -- Arnold being the predecessor -- improper shipment or failure to ship the inventory, or lost, damaged or destroyed inventory which losses or damages are attributable to a breach of this agreement.

THE COURT: Okay. I'd have to go look back at the briefs, but I thought maybe this 2.6(a) was mentioned in the briefs, but I'll have to go back --

MR. GLYNN: Yeah, 2.6(a), I apologize. Arnold shall maintain and preserve the inventory in as good a condition -- yes, I'm sorry, Your Honor. I was reading from 2.1(a) earlier, so I apologize for my confusion.

Yes, 2.6(a) was mentioned: "Arnold shall preserve and maintain the inventory in as good a condition as such inventory was received from New World or Riviana" -- New World and Riviana are now one entity. That was one of the amendments to this agreement -- "at any time requested by Riviana, and in accordance with the provisions of this agreement, GXO shall promptly return the requested inventory to Riviana in as good a condition as when received."

So I apologize, Your Honor, 2.6(a) does very much cover that.

THE COURT: Okay.

MR. GLYNN: And does spell out their obligations. My

apologies.

THE COURT: Okay. No problem.

So let's -- any further argument from plaintiff?

MR. GLYNN: No, Your Honor. I would answer any questions that Your Honor has and respond to what Mr. Friedman may offer.

THE COURT: Okay. I think that's all my questions at this point, so let me turn to Mr. Friedman.

MR. FRIEDMAN: Thank you, Your Honor.

Your Honor, I think your questions to counsel have sort of hit the nail on the head here.

This is -- Riviana was a customer of GXO. GXO had a contract to -- to provide warehouse management services to Riviana, and GXO's duties and its potential liability are governed by the contract.

The Court already dismissed a bailment claim that they filed, correctly. The parties -- the parties' relationship here is governed solely by the terms of the contract. And there -- you can -- there is no potential liability here when you look at the actual words of the contract, including words that Riviana studiously omits from its brief and from its argument, and I'll talk about some of those briefly, and keeping in mind the very standard principles of contract interpretation, which are, I think, well settled. And, of course, I know the Court's familiar

with the standards for summary judgment, so I won't belabor those, but it's incumbent on Riviana to show that there is no dispute of material fact.

He's already admitted that there's a dispute of material fact about whether they were damaged, so at a minimum, summary judgment can't be granted for that reason.

In terms of liability, when you look at the contract, the basic principles are, I think, very well known, the parties' intent is governed by the contract, by the words they use as reflected by the plain and ordinary meaning of the contract language.

Riviana can't rewrite the contract, GXO can't rewrite the contract, and the Court, it's not the Court's job to rewrite the contract. Construing the contract, which is the Court's job, the cardinal rule is the parties' intent, and you have to give effect to all of the language of the contract, not just selected parts, which is what Riviana is trying to do.

Mr. Glynn said he never saw a stronger contract. You know, I -- I don't think that's any statement to credit, but the bottom line is we look at the language of this contract. And what Riviana is trying to say is this imposes strict liability on GXO. No matter what happens, no matter who's at fault, no matter what caused the loss, GXO was responsible, and that's simply not what the contract says, Your Honor.

If you look at Section 2.6(d), and you can find that, Your Honor, the document number is 206-1. It's on page 7 of the contract. It's on page 8 of the filed document.

2.6(d) says, it says, "Arnold" -- as Mr. Glynn pointed out, that's predecessor of GXO, "shall be responsible for any losses or damages incurred by New World or Riviana, including, but not limited to, those losses or damages caused by or as a result of Arnold's improper shipment or failure to ship the inventory" -- that didn't happen here, of course -- "or lost, damaged or destroyed inventory" -- and this is the language -- "which losses or damages are attributable to a breach of this agreement by or willful misconduct or negligent acts or omissions of Arnold," GXO, and then this is the language that Mr. Glynn glosses over and actually literally omitted from their brief in their statement of facts, "provided that" I'll say GXO -- "provided that GXO shall be liable only for damages directly incurred by New World or Riviana as a result of GXO's conduct and shall not be liable for fines or penalties payable to New World or Riviana customers or other indirect or consequential damages."

So the contract makes clear that there has to be some fault on the part of GXO, breach of this agreement, willful misconduct or negligent acts, all of those require fault. This is not a strict liability agreement.

And to make that abundantly clear, it says "provided

that GXO shall only be liable for damages directly incurred as a result of GXO's conduct."

11:34:27 So Riviana must come forward on summary judgment -- this was an issue that came up in the motion to dismiss and our motion to dismiss was denied, but now we're at summary judgment, and on summary judgment, Riviana has to come forward with some evidence that their loss was the result of GXO's conduct.

11:34:46 And Arnold -- excuse me -- Riviana has admitted in its responses to our statement of facts that the warehouse, GXO didn't own the warehouse. It was owned by Exeter. Exeter's counsel's here. And GXO had a lease for the warehouse, and these are all facts admitted by Riviana.

11:35:14 The owner, the landlord, Exeter, was in control of the lighting system upgrade project of the warehouse and had sole authority to approve any alterations.

11:35:35 What happened was about a year before the fire happened, Exeter signed a lease amendment with GXO and the other tenants, where Exeter said we're going to install new lights and we'll be solely responsible for that, and we will undertake to do that and we will -- we will do it in good order.

11:35:57 Riviana admits that Exeter hired the subcontractors, the general -- the general contractor was McNelly Services, and the subcontractor, electrical subcontractor, was JTM.

Riviana has admitted, and this is -- if you want to see these admissions, Your Honor, ECF 210 is Riviana's response to our statement of facts.

They've admitted, Riviana, that it was McNelly and JTM who engaged in all of the conduct related to selecting those new lights and installing the fixtures throughout the warehouse. What happened was there was a fire. That fire destroyed most of Riviana's product. What Riviana also admits is that, and we have about a dozen paragraphs in our statement of facts documenting all of this, all of the first -- so there was a fire. All the first responders and all the subsequent experts, including the Illinois Fire Marshal and Exeter's own insurance surveyor and Riviana's surveyor all concluded that the fire was caused by the negligent -- the combination of negligent installation and incompatibility between the T-5, the new T-5 lighting components that were selected by McNelly and installed by JTM.

None of those experts or investigators concluded that GXO's conduct caused the fire or worsened the damages to GXO's inventory.

And, finally, I would direct the Court to two of the documents that Riviana has admitted. One of them is Riviana's own surveyor. It is Document 206-18. It is a survey.

The survey is kind of a term of art. It dates back to the admiralty days. It's EIMC. They are surveyors hired

by Riviana's insurers, and those surveyors looked at the warehouse and examined the circumstances, and they concluded -- this is on page 206-18, page 4 of 6, they concluded that there was a -- this is at the bottom of page 4, it's page 3 of the document, page 4 of the file heading at the top -- there was a faulty connection between the lighting fixtures and the bulb when the new lighting was installed. The faulty connection caused the bulb to overheat and ignite the plastic sleeve. This ultimately caused the plastic to melt and fall onto Riviana's product, resulting in the product catching fire.

So the damage was caused by the fire, and the fire was caused by the negligent installation of JTM and McNelly, which was the responsibility of Exeter, the landlord. All of that is undisputed.

Their own surveyor, Riviana's own surveyor, said on the next page: "We are of the opinion that the fire incident is the result of the lighting fixture located directly above the insured's product overheating. It melted a plastic sleeve, which ultimately dripped down onto Riviana's product, causing the product to ignite." They also note there was a fire marshal report which reaches the same conclusion. That's Document 206-12, and there are other -- all of which are in our statement of facts, Your Honor.

Every -- all of the insurers, including Riviana's own

insurer, the Fire Marshal, the Monee Fire Marshal, all of them reached the same conclusion. The loss was caused by the fire which was caused by the negligent installation of those lights.

11:40:08 So going back to 206(d), the provision that Mr. Glynn pointed the Court to, 206(d) says, and again it's page 8 of -- page 8 of Document 206-1 -- "Arnold shall be liable only for damages directly incurred by Riviana as a result of GXO's conduct."

11:40:37 This loss was not incurred as a result of GXO's conduct, so that is abundantly clear from the contractual language.

If that were not clear enough, the force majeure provision -- and, again, Mr. Glynn talked about it without looking at the language -- that language, Section 410, is in the same agreement, 206-1. It's page 17 of the ECF number, it's page 16 of the document. It says, "No party shall be liable to the other for a failure to perform its obligations under this agreement."

11:41:23 So Mr. Glynn was saying GXO had some obligation under this agreement to preserve Riviana's cargo, as he calls it; but this says, "No party shall be liable to the other for failure to perform its obligations under this agreement if prevented from doing so because of an act of God, fire, flood, explosion, civil disturbance," et cetera, "or for other causes

beyond the reasonable control of the party and not intentionally caused by such party."

So that's a very standard force majeure provision. It's very clear. And Mr. Glynn has essentially admitted that it applies because what he said was, he can't ignore it, so he comes up with a very convoluted argument that, well, it applies, but only after the fire.

If it applies, the reason it applies is because it was -- it was beyond the reasonable control of GXO, the fire, and it specifically talks about fire. So it's not clear what Riviana is expecting GXO to do.

The GXO -- the lights, the lights ignited, they -- the product burned. Did they expect GXO personnel to rush past the first responders, and do what exactly? There's just no -- there's no reasonable reading of this contract, Your Honor, in applying all of the language that would suggest that GXO can possibly be liable under this theory, given the language of the agreement.

Now, if you -- even if you were to accept their premise -- and, again, I want to make very clear that one should not, that language is clear -- they would still have to show, okay, then we -- what -- there had to be some evidence that GXO could have done something, and they have -- this is summary judgment -- they have come forward with no evidence as to what GXO possibly could have done in this situation. So,

again, there's just no basis for liability.

Let me discuss two other -- briefly two other provisions Mr. Glynn pointed to. He pointed to the indemnification provision, which is 4.1, and this is another example where Riviana is just disregarding the wording of the contract.

This indemnification clause, if you compare it to 2.6, you'll see that it tracks 2.6 in the sense that it requires -- whatever indemnification applies requires there to be some action on the part of GXO that would make GXO liable.

But more importantly, Your Honor, when Mr. Glynn read this provision to you and when they cited it in their brief, if you look at Document 189, page 6, when they quote this language, they say it says: "GXO shall indemnify and hold harmless Riviana."

What it actually says is: "GXO shall indemnify, defend, and hold harmless Riviana." That word "defend" is critical because what that shows, in addition to all the other things I've talked about and all the other context here, it is clear that this provision applies to indemnification for third-party claims, not first-party claims.

And we've cited to the Court case law. Riviana hasn't disputed this, they didn't even argue anything in response to this, so they've waived the argument at this point.

11:45:52 But we've cited case law to the Court that says, under both Pennsylvania and Illinois law, when an indemnification provision uses the word "defend," when it says indemnify, defend, and hold harmless, it applies only to third-party claims. And that's consistent with general contract interpretation. It would make -- you'd have to give effect to all provisions of the contract, and you can't read 4.1(a) to negate 2.6(d).

11:46:06 But the use of the word "defend" here is dispositive, and Riviana really has no argument in response to that. They literally had no response, so they've conceded that argument, and it certainly well comports with very standard case law and legal principles.

11:46:29 Finally, Mr. Glynn talked about the provision that says that GXO will have insurance. And the contract does say that. It is Section 2.11, which is on page 10 of the contract. It's page 11 of the ECF document, 206-1, page 11 of 101, and that, as Mr. Glynn said, that says that GXO is required to maintain warehouseman's legal liability insurance 11:47:07 with a certain minimum limit of liability and name Riviana as an insured.

11:47:24 In Mr. Glynn's argument, he conceded they're not arguing that we didn't do that. They're not arguing that we breached the contract by not doing that. They're now arguing, and he said it a few minutes ago, he said they -- they did get

that insurance and they did name us an insured -- as an additional insured. Therefore, they must be liable. That's really their argument.

The fact that they got insurance means that they are liable, and that, of course, is simply wrong under well-settled principles that we've cited the Court numerous cases, which, again, they didn't rebut or respond to, that say that the fact that you get insurance doesn't make you liable. The fact that the insurance applies to -- we had insurance that would apply if we -- if we, you know, did something that triggered liability, and that's exactly what the policy says.

If you look at -- if you want to see the policy, Your Honor, it's Exhibit 22 to our statement of facts. It is Exhibit 206 -- excuse me -- document number 206-23, and it says that on page 20 of the document, the insurance hereunder, it's page 22 of 53 of the E-document, 206-23: "The insurance hereunder covers the legal or assumed liability of GXO as a common or contract carrier, freight forwarder, insurer, bailee, custodian or otherwise for physical loss or damage to goods or merchandise."

So it is insurance that would be triggered if we had liability, which we do not.

The fact that we have insurance, and they've admitted we have the insurance the contract called for, but the fact that we have that insurance doesn't make us liable.

11:50:02 11:50:31 11:50:57 11:51:16 11:51:35

We raised some other issues, Your Honor, in our briefing. We pointed out that Riviana could have sued the people who everybody, including their own surveyor, their own insurer, the Illinois Fire Marshal, the Monee Fire Department, everybody said were responsible for this fire, that is, Exeter and McNelly and JTM.

They could have sued them. They chose not to. That was their tactical decision. They've known that since these report -- their own surveyor's report was issued in 2017. The date of that is -- they conducted the survey on June 22nd, 2017, and the date of the report is I believe around the same date. So they've known that since June of 2017.

I take that back. It's December -- it's December 7, 2017 was the final survey date noted.

So they've known since December of 2017 who was responsible, and they chose not to sue them. Now, they argue they couldn't sue them under some doctrine, but, in fact, because -- they call it the gist of the action doctrine, but as we briefed to the Court, they did not -- they were not in contractual privity with JTM or the landlord or McNelly, and under Illinois law, which would apply, and even Pennsylvania law, you can -- you can sue somebody whose negligence in circumstances like this cause you damage because it was foreseeable.

Now, they chose not to do that, which is fine, but

what they can't do is rewrite the contract and ask this Court to rewrite the contract so that GXO is made liable for a loss that GXO's conduct had nothing to do with and that the contract makes very clear we're not liable for.

11:51:56 I'll speak briefly about damages, Your Honor, because Mr. Glynn's already admitted, as he must, that there's a dispute about damages. The evidence that they've put on, that they presented on summary judgment for their damages, is not competent.

11:52:10 Their own survey report says, which they attached to their reply brief, their own survey report lists numbers, but it says on page 4, "full breakdown of costs to support loss calculations is enclosed with this report," and it wasn't. That's never been provided. We've never had a chance to take any discovery on that. 11:52:33

And Mr. Glynn says that the lawsuit was brought on behalf -- by Riviana on behalf of its subrogated underwriters. They've never identified who those underwriters are. They've never identified how much they've been paid by those underwriters. 11:52:50 Those underwriters could be the real parties in interest. None of that has been provided by Riviana, so all of that would be issues for discovery if the Court were to deny our cross-motion for summary judgment.

We believe, for all the reasons that I've said, that the contract is clear. 11:53:10 Riviana's reading of the contract

flagrantly violates very basic principles of contract interpretation, including giving effect to all of the language, and they have come forward with no evidence that even under their reading of the contract, no evidence that as to what -- what exactly we did that could have prevented this loss -- you know, we have discovery in the other case, which we've attached to our motion.

What happened was GXO's plant -- warehouse manager showed up, literally flicked on the light switch, and then, as the reports, all the reports, said, because the lights were negligently installed after a certain amount of time, the charges that built up, and that's what caused the fire, the negligent installation.

So if they want to explain what we could have done while all these first responders were rushing to the warehouse to try and deal with this fire, they've never done that.

But I want to come back to the most important point, the basic principles of contract interpretation are giving effect to all the provisions and make this very clear. This is not a strict liability, we're not -- we did not agree to reimburse them for any loss no matter who caused it, and one of the things they say in their brief is we're responsible for the fire even if we had nothing to do with it.

MR. GLYNN: That's incorrect.

MR. FRIEDMAN: Well, in their --

MR. GLYNN: That's a -- I let you go. That's incorrect.

MR. FRIEDMAN: Okay. Well, let's look at your reply --

(Indiscernible cross-talk.)

MR. GLYNN: Damage. Responsible for the damage.

THE COURT: Actually --

MR. GLYNN: I apologize, Your Honor.

THE COURT: -- you'll have a chance to reply, so let's keep going.

11:55:10

MR. FRIEDMAN: The -- it's their opposition, which is Document 213. That document was both a reply in support of their motion and a -- and in opposition to our motion.

What they said was one of the primary purposes of the

11:56:30

MSHA was for GXO to protect Riviana's cargo from damage, including damage by fire, and regardless of what or who caused the fire.

And that is -- so that's -- that's their argument, Your Honor, that -- and if you look at the other parts of

11:57:55

their brief, they say that -- they say that GXO had a contractual obligation to protect Riviana's cargo from burning in a fire, and, again, that's not what the contract says.

THE COURT: I mean, I see they say one of the primary purposes of the MHSA was for GXO to protect Riviana's cargo

11:58:33

from damage, including damage by fire, and regardless what --

MR. FRIEDMAN: Exactly.

THE COURT: -- or who caused the fire.

MR. FRIEDMAN: Yes, right, and that's their position. Regardless of who -- of what or who caused the fire, and that reads out of the contract the language in 2.6(d) that says they were only responsible for damage caused by our conduct. The contract doesn't say regardless of who or what caused the fire. 2.6(d) says we're only liable if it was the result of our conduct, which they've admitted it was not.

11:58:47

11:59:14

And if that weren't enough, the force majeure provision, 4.1 -- excuse me -- 4.11, says that we are not liable for 4.10 -- excuse me, Your Honor -- 4.10, we are not liable if -- even if you ignore all of that and say, okay, we had an obligation, which we did not for the reasons we've just talked about, no party shall be liable to the other for failure to perform its obligations if prevented from doing so because of fire or any other cause beyond the reasonable control and not intentionally caused by GXO.

11:59:44

So if they want to show, which they haven't done, that it was within our reasonable control to prevent the fire, which they can't do because they've admitted that the fire was caused by the negligent installation of the lights, which was the responsibility of the landlord. Their own surveyor said that, the fire marshal said that, everybody said that, so they can't do that, and they can't say that it was intentionally

12:00:11

12:00:31

caused by us.

So, again, there can be no liability. The cases that they've cited on force majeure where the clause wasn't applied were situations where there was something that the party seeking to enforce the force majeure clause could have done, and that's just not our situation.

One of the cases they cited, *1600 Walnut*, was one where the force majeure clause specifically carved out and said you're not excused from paying rent if there's a force majeure event, and the tenant said, well, but we're prevented from paying rent by the -- it was the COVID 19 quarantines, and the court said, well, that's not what the language says.

So those are all cases they cited. The cases they cited make the same point, which is you apply the force majeure provision as written. And in this case, it's very clear that we're not liable.

So just to sum up, Your Honor, very basic principles of contract interpretation, no dispute here as to what caused -- what damaged their product was the fire, no dispute about what caused the fire, which wasn't us, and the contractual language makes clear that if we're not -- if it wasn't our conduct that caused the loss, we're not liable.

And even if that were not the case, they haven't pointed to any language, or excuse me, they haven't pointed to any facts showing what our conduct -- how our conduct could

have prevented it.

THE COURT: Okay.

MR. FRIEDMAN: I'll add one more point, Your Honor. It's in the record. There was another customer of the warehouse of GXO's, Miller Coors, and there's references to that in our third-party complaint against the landlord.

And Miller Coors, they understood that the warehouseman's legal liability did not mean that we were liable for -- the fact that we had warehouseman's legal liability did not mean we were -- that our conduct was responsible, and they never brought a claim.

The -- so there's, again, there's a fundamental disconnect between the idea that because you have -- because you have warehouseman's insurance, which they admit we have, that means you're liable no matter whether or not you -- that you are liable for their loss whether or not you actually are liable under the underlying contract or that your conduct caused the loss. And, again, that's just not true, and we've cited cases to that effect.

THE COURT: Okay. Thank you.

So reply from Riviana, please.

MR. GLYNN: Your Honor, Mr. Friedman must have mentioned the words "strict liability" and "negligence" at least a dozen times in his statements. Those are tort theories, okay?

Strict liability -- let's make sure we're on the same page here -- strict liability, that's a tort theory, at least when I went to law school it was. And negligence, that was, like, literally the first tort that we're taught.

This isn't a tort case. This is a breach of contract case. The inability of GXO to read this contract is -- it's stunning, but read, we must. Read, we must.

2.6(d). "GXO shall be responsible" -- I'm going to say it nice and loud so everybody in the cheap seats can hear this. "GXO shall be responsible for any losses or damages incurred by Riviana, including, but not limited to, those losses or damages caused by or as a result of GXO's improper shipment or failure to ship the inventory or lost, damaged, or destroyed inventory, which losses or damages" -- "or damages are attributable to (a) breach of this agreement by or willful misconduct or negligent acts or omissions of GXO or its employees, representatives or agents, provided that GXO shall be liable only for damages directly incurred by Riviana as a result of GXO's conduct and shall not be liable for fines or penalties payable to Riviana's customers or other indirect or consequential damages."

So, the focus by Mr. Friedman has been on conduct, it has to be conduct, it has to be conduct; but for some reason, listed in 2.6(d) as to what that conduct is, the first thing mentioned is attributable to (a) breach of this agreement.

That's conduct. Breaching a contract is, by its very nature, conduct.

It doesn't mean negligence. That's why they even spell out next willful misconduct or negligent acts. This covers everything. You're negligent, to paraphrase *Goodfellas*, "Too bad. Pay me." You willfully act against our cargo, to paraphrase *Goodfellas*, "Too bad. Pay me."

And if you breach this agreement by not delivering our cargo back to us in the same good order and condition as required in 2.6(a), "Too bad. Pay me." That's the conduct.

Having to go after a third party, fourth party, electricians that will let a line and imputing that knowledge of these remote actors based on a survey report, that's insanity. We have a contract with you folks to store our cargo and not let it burn, period.

Okay. The indemnification. Again, their argument on the indemnification requires their same misinterpretation, inability to read 2.6(d). But here we go. Read, we must.

Section 4.1 of the MHSA states: "GXO shall indemnify and -- first thing it has to do, it has to indemnify --"and hold harmless," two different duties, duty to defend, duty to indemnify.

We can all agree that duty to defend is stronger than the duty to indemnify; however, they are still two independent duties, and this contract, 4.1, requires both.

Anyway, the contention by GXO that this somehow only applies to third parties and that Riviana never responded to it, well, that's untrue because I'm reading from page 10 of our reply memorandum of law in support of motion for summary judgment and in opposition to GXO's cross-motion for summary judgment, and I'm reading at page 10, and I will read it again: "GXO" -- I left out the apostrophe "s", and I apologize for that typo. I will fire my secretary, which is me.

"GXO's contention that Section 4.1 of the MHSA only applies to third-party claims is without merit. Such an interpretation is undermined by the language of 2.6(d)," which I just read, which clearly states "that GXO shall be liable only for damages directly incurred by Riviana as a result of GXO's conduct and shall not be liable for fines or penalties payable to Riviana, Riviana's customers, or other indirect consequential damages."

This specifically eliminates any duty on behalf of GXO to defend Riviana from third-party claims because it explicitly excludes third-party claims. We're saying you have to indemnify only for your conduct. What conduct? Being negligent. Okay. So if, you know, they didn't -- maybe they weren't negligent. We don't know; we don't care. That's not an issue. It's a breach the contract, not a tort case. Maybe they were; maybe they weren't.

But let's say they were negligent in causing the fire, contract says you're responsible. Let's say there was willful acts, you know, they had an employee who, I don't know, flicked a lit cigarette and then just left it there and let the cargo burn. We could arguably say that was willful, at least gross. I don't know. We don't care. Not at issue in this case.

The other type of conduct that triggers their liability is just breaching the contract, like, you've got to give us the goods back in the same condition, okay? That's literally your job.

You conduct business. What type of business do you conduct? You conduct business of storing people's cargo and not letting it burn down. When you breach that conducting of business, you're liable.

Nothing in our lawsuit has anything to do with negligence. We don't care who or what caused the fire because it's not an issue in this case. It's not a material issue of fact. We'll admit to JTM and McNelly all day long. Sure. Maybe they did. Maybe they were at fault. Great. GXO, good luck on your contribution indemnification claims. Have at it. You look like you have a slam-dunk case.

We have a slam-dunk agreement that GXO just refuses, nothing, nothing in this agreement covers anything they do. They don't have to get us insurance. They admit they got us

insurance, but that -- we're not arguing that their getting us insurance makes them liable. That's insane. That's absurd.

We're saying where is that insurance? You admitted you got it for us. Why haven't they paid us? Is that really such a difficult concept here?

12:12:42

Your Honor, I mean, again to borrow, you know, a pop culture reference, I feel like I'm taking crazy pills, Your Honor. I really feel like I'm taking crazy pills at this point.

12:13:02

If Your Honor has any other questions, I think all of our arguments are really -- have been set forth thoroughly in our papers, but for me to go through, you know, each and every one, those were the real doozies.

Oh, the force majeure clause. Oh, don't even get me started on the force majeure.

12:13:18

All right. So on the force majeure clause, because this is -- this is unbelievable.

I apologize, Your Honor. Just bear with me. This case gives me agita. I'm sorry.

12:13:39

Okay. So, one thing that Mr. Friedman totally admits -- omits and doesn't even really address in their papers anywhere is with respect to the force majeure clause, it states, and I'm reading from Section 4.10 of the MHSA, let's see, it says towards the bottom of that section: "During the period of any force majeure" -- okay, we can agree

12:14:17

12:14:45 12:15:08 12:15:28 12:15:46 12:16:07

that anything post-June 12, 2017 was post-force majeure -- "the services and compensation for the same shall be equitably adjusted, it being understood that Riviana shall have no obligation to pay any fees to GXO during such period if GXO does not provide any of the services during such period, provided" -- this is the language that just blows up GXO's argument, I don't blame them for not even mentioning it, why would they, it destroys their case -- "provided that the foregoing hereof shall not apply to monetary amounts due or owing by either party to the other prior to the force majeure period."

So, if Riviana owed, I don't know, a year's worth of back rent, excuse me, and other arrears to Riviana prior to the force majeure event, well, that fire wasn't going to get them out of having to pay that back rent. I can promise you, GXO would want it.

And also conversely, the fire doesn't get GXO off the hook for its monetary obligations, to wit: You either give us our cargo in the same good order and condition that you are contractually required to, or you better give us the monetary equivalent of it 'cause you owe us. Just like Riviana can't get out of having to pay back rent, they can't get out of their obligation for our cargo.

Any other interpretation offered by GXO I believe defies logic and reason on an epic level, and -- well, I

better not say the next thing I was going to say.

There were just so many inaccurate points.

Oh, the whole real party in interest. I mean, let's start with -- there was already a motion to dismiss in this case made by GXO about five years ago. You know, they didn't raise anything. They had no problem with a real party in interest back then.

12:16:43

So I would say that, you know, there's probably a solid estoppel argument; but that being said, are they disputing that Riviana is not a real party in interest? Like, who -- the relationship between Riviana and its insurers, while certainly discoverable, are immaterial.

12:16:58

Riviana has every right to represent its own interests and any interest as they may become present in the case, including subrogated underwriters.

12:17:17

Yes, Riviana may well have gotten paid. In fact, they did get paid. But now those insurers have a lien on this case.

Why should those insurers be out of pocket $2.2 million, especially when GXO has admitted they had warehouseman's insurance that named Riviana? They just haven't given us a good reason why that warehouseman's insurance hasn't paid.

12:17:31

To say they have to be liable for us, that's like if I get into a car accident, I go to Allstate, and they say, no,

12:17:46

12:18:02
12:18:17
12:18:36
12:18:53
12:19:11

you've got to prove that we're liable first. Wait, you're my insurance. Where is the insurance?

So that whole real-party-in-interest argument, I don't even know where that's going. It certainly, if it wasn't waived in the motion to dismiss phase, I think to bring it up in summary judgment is at least poor form, but I don't know where it gets them at the end of the day. It's just another misguided argument.

I'm surprised that counsel didn't bring up the failure of the Southern District to transfer the verification page from the ECF docket when this case was transferred to the Northern District of Illinois.

But with that, Your Honor, if there's any questions, I'll entertain them.

THE COURT: Okay.

MR. FRIEDMAN: Would it be helpful for me to briefly respond, Your Honor?

THE COURT: Sure. Yes, please.

MR. FRIEDMAN: Well, I -- I don't think I can win a contest with Mr. Glynn about who can quote from *Goodfellas*, you know, more quotes from *Goodfellas*, but I'll try and confine myself to the arguments that he raised.

I think maybe the most helpful thing I can do, Judge, I know we've been going back and forth for a while, is just to maybe mention one or two things to illustrate.

12:19:37 There was a lot of ground Mr. Glynn covered, but I think maybe what would crystallize this is when he read 2.6(d), he -- he read the language that they left out of their brief, the language "provided that Arnold shall be liable only for damages directly incurred by Riviana as a result of Arnold's conduct, as a result of GXO's conduct," that language "as a result of GXO's conduct."

12:20:01 And then he says, well, a breach of the agreement is conduct. So what he's doing is, again, our position is based on giving effect to all of the wording of the contract.

12:20:22 If you accept their interpretation, there would be no need to have that language, "provided that we'll only be liable for damages directly incurred as a result of GXO's conduct." That language would be unnecessary under his reading.

12:20:38 And, again, in terms of basic contract interpretation, you have to give effect to all of the provisions, and his -- their interpretation would render that surplusage, and that violates basic principles of contract interpretation.

And that, in a nutshell, I think, Judge, is the difference here. When you cut through all the back-and-forth that you've heard, that is the nutshell of this.

12:20:50 We are asking the Court to enforce all of the provisions of the agreement. Mr. Glynn made a point of

saying this -- you know, this is a contract case, this is not a negligence case, although as he pointed out, negligence is one of the -- the word "negligence" is used because we can only be liable by our willfulness conduct or negligent acts in 2.6(d).

12:21:10

But I completely agree that the issue is based on the contract, and the Court -- the parties can't rewrite it, they can't rewrite it, and you have to give effect to all the provisions, including that one.

12:21:23

And the same applies to 4.10, the force majeure provision. If he's saying -- he talks about, you know, the adjustments that were made after the force majeure event, so they're conceding -- by doing that, he concedes that this was a force majeure event. The fire was a force majeure event, and we cannot be liable for our failure to perform our obligations.

12:21:46

They're saying our obligation was to keep their cargo safe. We were prevented from doing that by the fire. They've admitted this was a force majeure event, and once they admit that, giving effect to all of the language of the contract including the first sentence, it says we're not liable, nor would they be for force majeure reasons.

12:22:03

We are not liable for our failure to perform what they claim is the obligation because of the fire, which they admit is a force majeure event.

12:22:20

12:22:46 12:23:09 12:23:25 12:23:42 12:24:01

I just want to briefly address where Mr. Glynn said, well, you did -- I pointed out that their reading of 4.1 ignored the word "defend" in the clause, and -- which they did, and when they quoted it, 4.1, which is on 206-1, that's the agreement, page 13 of 101, where it says, "We shall indemnify, defend, and hold harmless," we said in our opposition when you use the word "defend," and we cited cases that says this, using the word "defend" shows that the -- what the intent of the parties was is this would only apply to third-party claims.

If Riviana were sued by somebody, we'd have to defend; indemnify, defend, and hold harmless. It only applies to third-party claims. That's the point we made. Those are the cases we cited, and that's what they did not address.

The language he read from you on page 10 of their opposition, 213, doesn't talk about the fact that the word "defend" is used in that clause, doesn't talk about the cases that say when you do that, you only -- it only applies to third-party claims.

So that's the argument they've waived because they did not address that argument.

Finally on the insurance, Judge, I think there's just a fundamental misunderstanding on the part of Mr. Glynn about what warehouseman's insurance is. We've discussed this in our brief. Warehouseman's insurance applies when we have

liability under the agreement, and we don't have liability under the agreement for the reasons that we said.

I'm happy to answer any questions. I know it's been -- oh, he talked about that there's -- he said there was some estoppel about the real party in interest, I'm not quite sure what the basis of that is.

We have asserted all along that Riviana has never said that they've been damaged. We cited cases in our opposition that said if they've been paid by their insurers, they can't recover those amounts from us. He just admitted that they've been paid by their insurers. We don't know how much.

You know, discovery has been stayed. But he's essentially admitted that it's possible they haven't been damaged at all, but the extent to which they've been damaged, there is no competent evidence as to what that is. So you certainly cannot grant liability -- cannot grant summary judgment for that reason alone.

THE COURT: Okay. So I guess what I would be inclined to do today, it sounds like there's a variety of damages-related issues, such as the one that Mr. Friedman mentioned that is about full -- the survey says full breakdown of costs to support loss calculations is enclosed with the report, and such as this issue about what, if any, amounts has Riviana been paid by its insurers and what's the significance

of that with respect to damages, so I think for sure I cannot address summary judgment with respect to damages today.

I think what I can address is this -- the contract interpretation issues, which is a liability issue that the parties have teed up in their briefs, as well as in their arguments today. And so I'll just tell you my thoughts on that.

I, on this liability issue, I would, I guess, rule in favor of Riviana. It's not that -- I mean, I think there are a lot of good arguments being raised by GXO as well, but I think ultimately that when you look at Section 2.6(d) -- and I would say it's 2.6(d) that I would rely on there, and so there's no need to reach the interpretation of the indemnification provision, Section 4.1, because it's just a -- it's directly under 2.6(d), which -- let me just read 2.6(d). The parties have discussed it, but it's docket 206-1, CM/ECF page 8, and it's page 7 of the contract, and it says: "Arnold," which we all understand now is GXO that has -- we read Arnold as GXO.

So "GXO shall be responsible for any losses or damages incurred by New World or Riviana, including, but not limited to, those losses or damages caused by, or as a result of, GXO's improper shipment or failure to ship the inventory, or lost, damaged or destroyed inventory, which losses or damages are attributable to a breach of this agreement by or

willful misconduct or negligent acts or omissions of GXO or its employees, representatives, or agents, provided that GXO shall be liable only for damages directly incurred by New World or Riviana as a result of GXO's conduct and shall not be liable for fines or penalties payable to New World or Riviana customers or for other indirect or consequential damages."

So that's the complete provision. I think the -- I mean, the key parts of that include any loss or damages incurred by Riviana, including, but not limited to, those -- actually, I'm sorry, it's the lost, damaged, or destroyed inventory. That's the part that -- I mean, because it was clearly lost and damaged and destroyed. It was destroyed in a fire, which losses or damages are attributable to a breach of this agreement by, and I think it's the breach part that matters. It's because there's no allegation of willful misconduct by GXO, and even the negligent acts or omissions of GXO, it sounds like any negligence may have been by other -- others in the chain of contracts, but I would say breach of this agreement applies due to Section 2.6(a). I can come back to 2.6(a) in a minute.

But just continuing with the portions or the interpretation of 2.6(d), there is that provided clause, "provided that Arnold shall be liable only for damages directly incurred by New World or Riviana as a result of GXO's conduct and shall not be liable for fines or penalties payable

to New World or Riviana customers or for other indirect or consequential damages."

So I think that that "provided that" clause, it does make clear that damages under the contract must be a result of GXO's conduct, and GXO is not liable for what it says here, fines or penalties payable to Riviana's customers or other indirect or consequential damages.

So it's restricting -- it's avoiding consequential damages. If Riviana then has any other consequences downstream, that's Riviana's problem, and it does require that the conduct be GXO's conduct, not other entities' conduct.

But I do think that, you know, as a result of GXO's conduct, conduct in the context of this agreement, it does include the responsibilities in Section 2.6(a), preserving and maintaining the inventory in as good a condition as such inventory was received from New World or Riviana, and taking the responsibility of returning the inventory in as good a condition as when received. That's also the final language in 2.6(a).

So I think conduct is, just read in context, can encompass that duty from 2.6(a), and I would -- I just think conduct is broad enough to encompass -- yeah, the duty in 2.6(a) and arrangements that GXO is -- contractual arrangements that GXO is making with its landlord, Exeter. And so I just think it -- although it is not -- it doesn't

amount to strict liability, and I understand the point there, that this is -- it doesn't -- that's not how I would interpret it. I do think, even as it's written, it is broad enough to encompass the destruction of the inventory here.

12:32:31 I think that as a result, as I mentioned, there's no need to reach the meaning of Section 4.1 on indemnification.

As to the force majeure clause, Section 4.10, that clause says, and this is at 206-1, CM/ECF page 17, page 16 of the contract, that provision says: "No party shall be liable 12:33:06 to the other for failure to perform its obligations under this agreement if prevented from doing so because of an act of God, fire, flood, explosion, civil disturbance, interference by civil or military authority, or terrorism, accidents, or because the continuation of the services at the warehouse 12:33:29 would be in violation of any future governmental laws, rules, or regulations, or would cause or create any material safety, health, or environmental concerns, or for other causes beyond the reasonable control of the party and not intentionally caused by such party, collectively force majeure."

12:33:46 And then it just going on from there.

But -- so I think, again, you have to look at the full sentence, the full context of that provision. So it's talking about other causes. So, first of all, it does say fire expressly, so that's important to note, and this, of 12:34:05 course, was a fire, as everyone agrees.

But then you need to read that in the context of the entire sentence and clause. So at the end of it, it says, "for other causes beyond the reasonable control of the party and not intentionally caused by such party," no one contends there was any intentional causation here, but there is that language, "beyond the reasonable control of the party."

I think in the context of this sort of contract where it is among -- the whole -- or one of the express provisions of the contract is to maintain, preserve and maintain the inventory in as good a condition as such inventory was received from Riviana, and in the context of this contract, which is part of a whole chain of contracts, I think that provision as to force majeure, it's really talking about what that says, "other causes beyond the reasonable control of the party."

And in that context, I mean, GXO was able to contract with Exeter that Exeter would undertake the lighting renovation and be in charge of that update project and be in charge of the general contractor and subcontractor, or just be in charge of the project generally.

And so the way I read this provision is that if it were some sort of natural disaster, that's what this is getting at, is things like, you know, a fire that came from outside the facility, a flood that just, you know, overwhelmed the entire facility, as opposed to an incident that occurred

within the control of the landlord. This clause just seems much more about the former type of incident, not the latter.

And so I do not think that the force majeure clause, even though it does literally say the word "fire," I think a kind of contextual reading of this clause is not -- it doesn't apply to this particular circumstance.

So on the liability issue, I think that I would -- I would grant Riviana's motion and deny GXO's cross-motion for those reasons.

I think that now, I guess, I would just ask if the parties -- but, again, I appreciate all the parties' arguments, and those are very -- you know, those are very reasonable arguments on the part of GXO, and so I think -- I mean, I understand why it's been litigated and not resolved.

Okay. So with that, what makes sense? Should we -- do you need to now do damages discovery? Would you like to take some time to confer about the schedule going forward?

I could refer the case to the magistrate judge for supervision of any further discovery and for settlement. I guess those are some of the options.

If you would like to either suggest something now or think about it, we can set a status hearing or status report if you need some time to think about how to proceed.

MR. GLYNN: Yeah, obviously -- thank you, Your Honor -- just given the age of this case, you know, we would

like to move expeditiously with discovery on damages.

So, yes, if we could get it assigned to a magistrate to supervise and get a -- you know, a real tight scheduling order in place for damages, I don't see how this should really take, you know, much more than, you know, three to six months.

MR. FRIEDMAN: Your Honor, if I may, the -- I understand -- I understand the Court's ruling. There certainly needs to be discovery on the damages, but, in addition, if I understand the Court's ruling correctly, what the Court has said is that you're denying our motion on liability, but by granting their motion, there's still issues, I believe, on liability that need to be the subject of discovery.

In other words, what -- what could we have done? What are they going to say we could have done to prevent the fire? What could we have done to mitigate the fire damage? Those are all, I believe, legitimate issues for discovery.

I understand the Court's ruling how you read the agreement is, if I understand correctly what Your Honor said, you say that, you know, this -- if it's something that we could have -- the contract doesn't preclude them from arguing that we could have done something, and there needs to be discovery on exactly what that is.

So the discovery, I think, is not just limited to the damages but also to what they're going to say GXO could have

done or didn't do or should have done.

Mr. Glynn gave the example of, you know, throwing a lit cigarette under the pasta. We didn't do that. So I believe, you know, it certainly would be one of our defenses that even if you read the contract the way they do and as the Court indicated it's going to in its ruling, there still has to be discovery on what could we have done or what did we -- you know, what -- what did we -- what could we have done, should we have done to prevent the fire or mitigate the damages from the fire.

12:40:11 12:40:31

THE COURT: I mean, I guess I thought I was basically saying that GXO could have arranged their contracts with the landlord differently. I mean, so I don't -- it sounds like everyone kind of agrees that the fire was not something that GXO did. It's more -- it's something that it sounds like everyone agrees was an issue with McNelly and JTM, or at least as far as the -- yes.

12:40:50

MR. BARGER: Your Honor, McNelly denies those allegations.

THE COURT: Okay.

12:41:15

MR. FEINSTEIN: So does Exeter.

MR. FRIEDMAN: Yeah, there's a third-party complaint, and so all of those issues, I think, are going to have to be litigated.

THE COURT: Okay.

MR. FRIEDMAN: The third-party complaint that we've said that Exeter needs to defend us, defend this case, and --

MR. GLYNN: And, Your Honor, I would ask at this time, based on Your Honor's ruling, my understanding of Your Honor's ruling is that you've granted plaintiff's motion for summary judgment on the issue of liability based on the very clear language of the contract, that there was a breach of the contract here, that the force majeure clause does not apply.

So under the readings of 2.6(a) and 2.6(d), GXO has breached the contract, and the force majeure clause doesn't apply. The only issue then left for plaintiff's case vis-a-vis GXO is the issue of damages.

What I would ask for, given that this case has just celebrated its seventh birthday, would be that any of the downstream claims for contribution and indemnification, I would ask that those be severed because that type of discovery will take much longer, and that would be prejudicial to the plaintiff, who's already had to wait a good amount of time on this case.

So I would request that that portion of the case be settled. They can battle it out between themselves as to who did what to whom and when, who was negligent, who wasn't negligent. We don't care. Our issue with damages is just with GXO, and that's something that can be wrapped up in about, you know, three months tops.

MR. FRIEDMAN: I don't think it would be three months, Your Honor.

MR. GLYNN: I believe that would be the most prudent course for the Court to take, would be to sever the downstream actions immediately.

12:42:58

MR. FRIEDMAN: And, you know, this idea of severance, which we haven't heard before, I think -- I don't think that's practical because of the relationship of the issues. The other parties may want to be heard on that, and maybe that's something that should be briefed.

12:43:12

I would certainly think that would be -- I don't think that's practical, and it would be prejudicial to us because of the overlap of the issues, the commonality of the issues.

12:43:24

MR. GLYNN: I think getting some finality as to the amount of damages that are at stake actually may facilitate the downstream issues.

MR. FRIEDMAN: Well, there's no reason we can't do the damages, you know.

12:43:38

MR. GLYNN: When we were at the mediation back in December of 2022, yes, and I believe most of the gentlemen that are here were in attendance on that mediation, it was a Zoom mediation, I think everybody was in agreement that the outcome of this motion, what we're all sitting here for now, was really going to drive how the rest of the case goes.

12:44:02

It could just be a hunch, but maybe what we could do is digest the proceedings of today, Your Honor's decision, and maybe -- just throwing this out there, spitballing -- another mediation with all parties, sooner than later, could be of some benefit.

12:44:29

My point is maybe if everybody puts in something, we could get this case settled now at this point. Just a hunch.

I'm sorry, I would prefer that, Your Honor, either that or to have it severed, but to just have to go through what could be three or four more years of discovery and litigation for the downstream claims, that I really believe would be very prejudicial to Riviana.

12:44:49

THE COURT: I mean, it does sound like if the issue is what was the total amount of damages to Riviana, that's one issue, and then there's a separate issue of who's at fault for the destruction of the pasta, then, I mean, you could design discovery in a way to at least accelerate the issue of what's the total damages and you could structure discovery in a way that took that into account, just, you know, basically prioritize that issue in discovery and try to resolve it sooner rather than later without necessarily severing.

12:45:07

12:45:38

I mean, I do think it's a little bit tricky to sever because, in a way, it's easier when everyone with some interest is involved.

I also think now that there is a ruling on it, we

12:45:57

know who -- who is still involved in the case or whose insurers are still involved in the case, so that does hopefully give you some more information that I hope could help with settlement.

12:46:14 I mean, you never know whether that will work or not, but it does seem to me like it could be worth taking another run at settlement at this point for sure.

So there is a referral that's in place actually. Looking through the docket, it's 209. There's a referral, and 12:46:36 actually -- so 209 is not the referral, but it's just a minute entry before Judge Cummings who, in docket 209, stayed discovery. And it says, "Within seven days of the resolution of the cross-motions for summary judgment, the parties shall file a joint status report, setting forth a proposed schedule 12:46:59 for the remainder of discovery and whether the parties are mutually interested in a remote video settlement conference with the court."

Now, that minute entry was issued by Judge Cummings who has since become a district judge, and the new magistrate 12:47:19 judge I see is Judge Appenteng, so basically you would -- but that order from Judge Cummings still remains in place, so it seems like the next step would be within seven days, file a status report before Judge Appenteng that addresses any proposed schedule for discovery and whether the parties are 12:47:41 interested in a settlement conference.

The referral is docket 110 actually. So the referral is also on the docket at docket 110.

MR. FRIEDMAN: Your Honor, before we conclude, given the potentially dispositive nature of the ruling, would the Court consider certifying this issue for appeal now?

12:48:04

THE COURT: Okay. So that would be --

MR. FRIEDMAN: We can file a motion.

THE COURT: -- a request under Rule 54(d)?

MR. FRIEDMAN: Yes. I believe that's the right rule, Your Honor.

12:48:22

THE COURT: Any objection?

MR. GLYNN: I don't know that I can --

THE COURT: Sorry, not 54(d), 54(b).

MR. GLYNN: 54(b).

12:48:38

MR. FRIEDMAN: Yeah, I think that's right, Your Honor.

MR. GLYNN: Well, it's their right -- they're going to -- is that the position, that you're going to appeal it? So it's either do it now or, you know, force the issue.

12:48:59

MR. FRIEDMAN: We'd -- yes, we believe it's appropriate to appeal it now, given the nature of this issue.

THE COURT: Okay. So Rule 54(b) allows judgment on multiple claims or involving multiple parties, and it says, "When an action presents more than one claim for relief, whether as a claim, counterclaim, cross-claim, or third-party

12:49:24

claim, or when multiple parties are involved, the court may direct entry of a final judgment as to one or more but fewer than all claims or parties only if the Court expressly determines that there is no just reason for delay. Otherwise, any order or decision -- any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."

I don't know whether -- I mean, it's speaking in terms of claims and -- I don't know whether -- so I guess my thought is if it would be more efficient to appeal now, as opposed to appealing at the end, no problem, I'm happy to certify and enter a final -- a partial final judgment.

The one thing I'm not totally clear on is is this -- I mean, this rule is speaking in terms of the claims and rights and liabilities of fewer than all the parties, so I don't know whether -- I just -- I'm not sure that I've run across a situation where it's liability versus damages, as opposed to, you know, like, here's a judgment on a particular claim following all the way through the damages. And maybe it's fine and it's okay, and if it is fine and okay, then I'm happy to certify it.

I just don't know sitting here right now.

MR. FRIEDMAN: Would it be helpful, Your Honor, if we submitted a memorandum to you in, say, 10 days?

THE COURT: Sure.

12:51:15 MR. FRIEDMAN: Okay. We'll do that.

THE COURT: Okay. So that would be --

MR. GLYNN: Yeah, and before I could just not object to something like that, I would have to run that, I think, by my client. They make -- you know, if they make an application 12:51:30 for it, I don't -- I don't think we would -- well, I would have to look into it. I would want to see what their papers say.

THE COURT: Okay. So why don't -- ten days is --

MR. FRIEDMAN: It would be Monday the -- is it 12:51:47 August 4th, is that the Monday?

THE COURT: Monday, August 5th.

MR. FRIEDMAN: It's the 5th? Thank you, Judge. That's fine with us.

THE COURT: Why don't by that Friday, August 9th, the 12:51:59 plaintiff -- and anyone else who would like can file, if you oppose the request for a 54(b) judgment, partial final judgment, you can -- you can file either a response on the merits, like, here's why we don't think 54(b) judgment is appropriate, or you can -- if you need more time because 12:52:24 that's less than a full week, you can say we are going to

oppose the -- you just basically file a short notice that says we plan to oppose the request for 54(b) partial final judgment. Here's how long I request to file the actual merits response. That's what I would say just to try to keep it moving.

12:52:41

So request for 54(b) partial final judgment August 5th, either merits response or request for additional time, August 9th.

Okay. All right. Anything else we should address?

12:53:11

MR. GLYNN: No. Thank you, Your Honor.

MR. FEINSTEIN: Your Honor, I apologize, are we leaving the standing -- the last order that you referenced earlier regarding the discovery that the parties will issue a joint discovery plan within seven days?

12:53:29

THE COURT: Well, okay, so that was an order from the magistrate judge, and so since we're now looking at this 54(b) issue, does anyone -- I mean, it sounds like we should probably just pause on further steps in discovery or settlement until we figure out the 54(b), right?

12:53:49

MR. FEINSTEIN: That's --

MR. FRIEDMAN: I think we all agree on that, yes, Judge.

THE COURT: Okay.

MR. FEINSTEIN: I think that makes sense, Your Honor.

12:53:58

MR. GLYNN: If that's the case then, I mean --

well -- I wouldn't object to it, so we could speed the process up along, it will be up to Your Honor whether or not to issue it, so on behalf of my client, I'll say they won't object to certifying.

12:54:13 THE COURT: Okay. Well, then I'll -- so no status report is due about discovery or settlement. I still would find it helpful just to confirm that a 54(b) partial final judgment is appropriate under this circumstance, so let me ask -- or let me just ask that GXO still please file that --

12:54:46 MR. FRIEDMAN: That's fine, Judge.

THE COURT: -- memo by August 5th.

Also, if I'm going to enter it, I may need a proposed -- what should the partial final judgment look like, I may need a proposed final judgment from the parties.

12:55:12 So I guess if you could maybe submit that along with your memo, and it sounds like you're not objecting to it, so --

MR. GLYNN: No.

THE COURT: -- so no memo due on August 9th.

12:55:30 Does anyone see a need for a deadline for you to weigh in on this 54(b) issue? Does anyone else want an opportunity to do that?

MR. WOLF: No, Your Honor.

MR. FEINSTEIN: No, Your Honor.

12:55:45 MR. BARGER: No.

THE COURT: So the only deadline is the August 5th memo and proposed 54(b) partial final judgment from GXO.

Okay. Thank you, everybody.

MR. FRIEDMAN: Thank you, Your Honor.

12:55:58 MR. GLYNN: Thank you, Your Honor.

THE COURT: Take care.

(Concluded at 12:55 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell* *August 5, 2024*
Kathleen M. Fennell Date
Official Court Reporter