```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   RIVIANA FOODS, INC.,                 )  No. 18 C 6550
                                          )
 4                    Plaintiff,          )
                                          )
 5              vs.                       )  Chicago, Illinois
                                          )
 6   GXO WAREHOUSE COMPANY, INC.,         )
                                          )  June 17, 2025
 7   Defendant/Third Party Plaintiff.     )  5:04 p.m.

 8                       TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE JEANNICE W. APPENTENG, MAGISTRATE JUDGE
 9
     APPEARANCES:
10
     For the Plaintiff/
11   Third Party Defendants:  CARUSO GLYNN, LLC,
                                BY:  MR. LAWRENCE C. GLYNN
12                              243-03 Northern Boulevard, Suite 201,
                                Little Neck, New York  11362
13
     For the Defendant/
14   Third Party Plaintiff:  THOMSON COBURN LLP
                              BY:  MR. LAWRENCE C. FRIEDMAN
15                                 MS. ALLISON N. MANGER
                              One US Bank Plaza
16                            St. Louis, Missouri  63101

17   For Third Party
     Defendant Edener:        FORD & BRITTON, P.C.
18                            BY:  MS. MARY YONG
                              120 North LaSalle Street, Suite 950,
19                            Chicago, Illinois  60602

20   ALSO PRESENT:            MR. TOMAS APPLEYARD

21                            PATRICK J. MULLEN
                          Retired Official Court Reporter
22                      United States District Courthouse
                            219 South Dearborn Street
23                         Chicago, Illinois  60604
                              (312) 435-5565
24
                          *   *   *   *   *
25
         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

1     (Telephonic proceedings on the record.)

2          THE CLERK:  18 CV 6550, Riviana Foods, Inc., versus

3     Jacobson Warehouse, Inc.

4          THE COURT:  Good afternoon.  Can the parties please

5     put their appearances on the record, beginning with the

6     plaintiff?

7          MR. GLYNN:  Good afternoon, Your Honor.  Lawrence

8     Glynn for the plaintiff Riviana and underwriters.

9          THE COURT:  Good afternoon.

10         MR. APPLEYARD:  Good afternoon, Your Honor.  This is

11    Tomas Appleyard appearing for the underwriters and Riviana as

12    well.

13         THE COURT:  I'm sorry.  I didn't hear you at all.

14    You'll either have to get off speakerphone or speak more

15    clearly.  I didn't understand at all the last person that just

16    spoke after Mr. Glynn.

17         MR. APPLEYARD:  No problem.  My name is Tomas

18    Appleyard.  I am from Barbuss, and I am appearing for

19    underwriters and Riviana as well.

20         THE COURT:  Okay.  Can you spell your last name?

21         MR. APPLEYARD:  It's Appleyard, Apple as the fruit,

22    yard as Scotland Yard all together.

23         THE COURT:  Okay.  Thank you.

24         MR. APPLEYARD:  You're welcome.

25         MS. YONG:  Good afternoon.  Mary Yong, Y-o-n-g, from

```
 1   Ford & Britton for third party defendant Exeter.
 2            THE COURT:  Okay.
 3            MR. FRIEDMAN:  Good afternoon.  This is Larry Friedman
 4   with Thomson Coburn, and I represent defendant and third party
 5   plaintiff GXO Warehouse Company.
 6            THE COURT:  I'm sorry.  Can you --
 7            MR. FRIEDMAN:  And if I could clarify something --
 8            THE COURT:  Yes.
 9            MR. FRIEDMAN:  I'm sorry.  Go ahead.
10            THE COURT:  Can you say your first and last name
11   again?
12            MR. FRIEDMAN:  Yes.  Can you hear me okay now?
13            THE COURT:  Yes, yes.
14            MR. FRIEDMAN:  All right.  The first name is Larry or
15   Lawrence, L-a-w-r-e-n-c-e.  The last name is Friedman,
16   F-r-i-e-d-m-a-n.
17            THE COURT:  Okay.
18            MR. FRIEDMAN:  My law firm is Thomson Coburn, and I
19   represent the defendant and counterclaim plaintiff, GXO
20   Warehouse Company.
21            THE COURT:  Yes, okay.
22            MR. FRIEDMAN:  I don't know -- I don't know if one of
23   my colleagues, Allison Manger, is on.
24            Are you on, Allison?
25            MS. MANGER:  Yes, I am on, Larry.
```

```
 1              MR. FRIEDMAN:  Okay.  Thank you.

 2              Allison Manger is also with my firm.

 3              THE COURT:  Okay.

 4              MR. FRIEDMAN:  M-a-n-g-e-r.

 5              THE COURT:  Got it.

 6              MR. FRIEDMAN:  Now before you go on, I think it would

 7    be helpful to clarify something.  Mr. Appleyard, I don't

 8    believe he's a counsel.  I believe he's an officer of a party.

 9    He's obviously welcome to attend, but I think the record should

10    be clear that he's not representing anybody.  He's representing

11    Barbuss --

12              THE COURT:  Yes, I understand.

13              MR. FRIEDMAN:  -- which is --

14              THE COURT:  I know who he's with.  I understand.

15              MR. FRIEDMAN:  Okay.

16              THE COURT:  Thank you.  I can clarify that for the

17    record.

18              MR. FRIEDMAN:  All right.  I apologize.

19              THE COURT:  Thank you.

20              MR. FRIEDMAN:  All right.  I apologize then.  Thank

21    you.

22              Rainbow Lau, Rainbow Lau is also on, and she's with --

23    she's in-house counsel for GXO.

24              THE COURT:  Okay.  All right.  Anyone else on the

25    line?
```

1          (No response.)

2              THE COURT:  Okay.  All right.  So we are here to

3    discuss two issues.  The first is -- and maybe this is why

4    Mr. Appleyard is maybe on the line -- the first issue has to do

5    with Liberty Corporate Capital.  Let's see.  It's not --

6    forgive if I call a plaintiff a defendant and a defendant a

7    plaintiff because we have the counterclaims, but the issue

8    is -- who is asking?  Right.  GXO is asking the Court to order

9    Liberty to produce responsive documents.  That's the first

10   issue that we're going to deal with, right?  So the documents

11   were requested pursuant to what appears to be or what the Court

12   understands to be a Rule 30(b)(6) deposition notice that was

13   served on Liberty but also included document requests.

14             So first I'll ask Mr. Friedman.  Is that issue -- is

15   that still an issue with the Court, meaning that there's still

16   a dispute?  We'll just start there.

17             MR. FRIEDMAN:  Yes.  Excuse me.  Thank you, Your

18   Honor.  Yes, that is in dispute because Liberty has not

19   produced any of the -- has not produced anything, and they've

20   never served objections.  We were told by Mr. Glynn that they

21   would be producing documents --

22             THE COURT:  Okay.  You can stop.

23             MR. FRIEDMAN:  -- and you saw from the status

24   report --

25             THE COURT:  You can stop.  You can stop.  I just

1    wanted to know if this was still in dispute.  Okay?

2              MR. FRIEDMAN:  It is.

3              THE COURT:  So thank you for letting me know it's

4    still in dispute.

5              MR. FRIEDMAN:  It is, Your Honor.

6              THE COURT:  My concern is similar to an issue that you

7    raised.  Liberty is not a party in this case.  So even if

8    Liberty initially agreed to produce documents and a 30(b)(6)

9    witness, now that it appears that it has stopped voluntarily

10   complying, if you will, the Court can only intervene if there

11   is a subpoena at issue because, as you noted, neither Barbuss

12   nor Liberty is a party in this case.

13             So I just want to confirm that there is no subpoena

14   that has been served on Liberty.  Is that correct?

15             MR. FRIEDMAN:  Your Honor, this is Larry Friedman.

16   Yes, that is correct.  If I could just make one point, Liberty

17   is -- Liberty is a party because the lawsuit was filed on

18   behalf of Riviana and its interested subrogated underwriters.

19   That's in the caption of the case.  That's in the complaint,

20   and they are -- so, therefore, they are parties.  You heard

21   Mr. Glynn say he represents Riviana and the underwriters.  He

22   has represented to us -- and we talk about this in the status

23   report -- that they are parties.  They are listed in the

24   complaint, or they are by category.

25             They withheld information from us about exactly who

1   the underwriters were until about a year or so -- about eight

2   months ago.  Now that we know who they are, we served this

3   deposition notice.  So they want to be treated as a party.

4   They've identified themselves as parties.  Mr. Glynn has said

5   they are parties.  So we don't believe a subpoena is required

6   for those reasons.

7         THE COURT:  Okay.  I don't know if I --

8         MR. FRIEDMAN:  And we did a similar -- I'm sorry, Your

9   Honor.  If I could just finish one more thought, we took a

10  similar approach with Talbot.  In discovery, they -- Riviana

11  identified who the interested underwriters were.  They listed

12  about 20 of them.  They also said two of them had claims

13  authority, and they are Liberty and Talbot.  We served a notice

14  on Talbot, and Talbot has produced documents.  For whatever

15  reason, Liberty has not.

16        THE COURT:  Okay.  Okay.  So I'm not as familiar with

17  some of these insurance cases or claims, so I just want to make

18  sure we're all on the same page.

19        Mr. Glynn, it's your position as well that Liberty is

20  a party in this case?  Is that what your understanding is?

21        MR. GLYNN:  Yes, Your Honor.  While me and

22  Mr. Friedman may not agree on many things, we do agree that

23  Liberty is, indeed, a party.

24        THE COURT:  Okay.

25        MR. GLYNN:  They are.  They are a party.  Mr. Friedman

1    is 100 percent correct.  I may disagree with some of the nuance

2    of what was said in Mr. Friedman's response, but at the end of

3    the day, yes, Liberty is a party.  We do represent Liberty with

4    a little caveat, and that is why Mr. Appleyard is also on this

5    call to answer any further questions the Court may have.

6         THE COURT:  Okay.  So that was the next set of

7    questions then.  So, Mr. Glynn, you are or you are not a person

8    responsible or the lawyer representing Liberty as it relates to

9    the 30(b)(6)?

10        MR. GLYNN:  I --

11        THE COURT:  Well, as it relates to this case because

12   here's -- go ahead.

13        MR. GLYNN:  Yeah, yes, I guess the short answer is

14   it's complicated.  I do not -- I am not permitted to have any

15   direct contact with Liberty.  Everything has to be communicated

16   through their primary counsel, which in this instance is

17   Barbuss with whom Mr. Appleyard is affiliated.

18        THE COURT:  Okay.  Well, so then I don't -- I don't --

19   you all will have to explain this to me.  So if someone is

20   being held out as a party in this case, then they need to have

21   counsel in this case.  Otherwise, there's not -- or they're

22   saying they're going to appear pro se.  You don't have to have

23   counsel if you don't want to, arguably, but I can't -- I'm not

24   going to engage with individuals who say that they're parties

25   in the case but there's no lawyer that's representing them in

```
1    full in this case.  We can't have that.
2              MR. GLYNN:  Well --
3              THE COURT:  So unless --
4              MR. GLYNN:  Well, yes, of course, Your Honor, and
5    that's understood.  Mr. Appleyard, for purposes of this case,
6    is their counsel, their primary counsel.  I would be considered
7    more of their U.S. local counsel.
8              THE COURT:  Okay.
9              MR. GLYNN:  So Mr. Appleyard is an attorney.
10   Mr. Appleyard does represent Liberty.
11             THE COURT:  Okay.  Again, if these individuals, the
12   interested subrogated underwriters, if everyone is going to,
13   you know, say they are parties in the case, then they need to
14   have counsel of record, meaning they filed an appearance in
15   this case, you know, and they need to be added as parties in
16   the case because they're not -- as far as this Court is
17   concerned, they're not getting any notice of filings in the
18   case or the Court's orders in a meaningful way to even be held
19   accountable for those, the Court's orders.
20             You see, that's the part that's problematic, right?
21   Because, you know, if you don't -- if the party itself is not
22   named on the docket and have counsel that has an appearance, an
23   appearance filed, and is receiving CM/ECF notices and thereby
24   can be held accountable to have notice of this Court's orders
25   and everything else that's going on in this case, that's a
```

 1    problem for me or for this Court, anyway.

 2         MR. GLYNN:  Of course.  Of course.  I'm sorry, Your

 3    Honor.  Please continue.

 4         THE COURT:  No, I wasn't saying anything else.

 5         MR. GLYNN:  Okay.  Yes, again, Lawrence Glynn.  I'm

 6    going to say something first, and then Mr. Appleyard will jump

 7    in.  My understanding is the client in this instance, Liberty,

 8    has been, you know, kept abreast of every step.  I will turn it

 9    over to Mr. Appleyard to continue.

10         MR. APPLEYARD:  Yeah, sure.  Thank you, Lawrence.

11         So, Your Honor, if you would allow me to, I'd like to

12    just clarify something.  As Lawrence clearly stated, I am

13    acting for the underwriters.  We are the lawyers for the

14    underwriters, the international lawyers handling this cases on

15    their behalf.  Lawrence is our local lawyer in the U.S.  Okay?

16         So we have received this document -- document

17    disclosure request basically, and we have said that we were

18    parties that were requested.  And just to be clear, it's not a

19    straightforward search, and this has caused some stress in our

20    plans.  Unfortunately they don't have similar systems for

21    keeping their own records.  They all handle their claims.  They

22    are all Lloyds underwriters, and they keep what's called ECF

23    files, which is basically electronic claims files, which is the

24    standard for any Lloyds underwriter.  They normally communicate

25    through this system, but the way they store their records and

1   all the units related is not the same.  Unfortunately, this has

2   caused some difficulties in the process of gathering all this

3   information.

4          Now we have managed to get someone who can go a little

5   further and do a proper search within the ECF files and get us

6   the accurate responses, but unfortunately the answers have not

7   been forthcoming at least for the underwriter Liberty.  So it's

8   not --

9          THE COURT:  Okay, Mr. Appleyard.

10         MR. APPLEYARD:  -- that our clients are not willing to

11   cooperate with this.

12         THE COURT:  Mr. Appleyard, I'm going to interrupt you.

13         MR. APPLEYARD:  Yeah, sure.

14         THE COURT:  I'm going to interrupt you.

15         MR. APPLEYARD:  Sure.

16         THE COURT:  You know, I'm not dealing with the merits

17   of this issue until I can figure it out.  Again, you all may be

18   more verse in these issues than I am.  I will fully admit that

19   I have not had as many insurance cases or issues like this.

20    (Unidentified speaker speaking on the phone.)

21         THE COURT:  We lost someone or someone joined.

22         MR. APPLEYARD:  Hello?

23         THE COURT:  All right.  Can you all still hear me?

24         MR. APPLEYARD:  Yes.

25         MR. GLYNN:  Yes, Your Honor.  Larry Glynn.

```
 1              THE COURT:  Okay.

 2              MR. FRIEDMAN:  Larry Friedman for GXO.  Yes, we can

 3    hear you, too.

 4              THE COURT:  Okay.  All right.  So, yes, I'm going to

 5    deal -- I'm not inclined to deal with the merits of this issue

 6    until we can figure out what it is, because any order that I

 7    would issue, I'd like to know that I can be -- again, that I

 8    would be able to enforce it with any type of contempt or

 9    sanctions or whatever else that would be needed to do.  So I

10    want to ensure that the party that it's directed at is, indeed,

11    a party in this case with a lawyer on record so they have

12    notice, full notice of anything that this Court issues.

13              That's my concern.  You know, I can say all of the

14    things, yes, Liberty do X, Y, and Z, but today they're saying

15    they're a party with no apparent filing on the docket or a

16    lawyer of record on the docket, and tomorrow they may say:

17    Well, actually that's not the case, Judge.  We're not really in

18    this case, and you really have no, you know, jurisdiction or

19    authority over what to tell us on what we can do or not do.

20              I'm not having that, so we need to figure it out.

21    Again, I'm not hearing clear enough answers from you all as a

22    group, so I need to either figure it out on my own or I will

23    ask the parties for some information.  But I'm not hearing

24    enough right now from you all to make a decision or to order

25    that an entity who is from this Court's perspective a non-party
```

1   to do something.  So again, I'm going to table this particular

2   issue for now and come back to it.  All right.

3          MR. FRIEDMAN:  Your Honor, this is Larry Friedman.

4          MR. GLYNN:  Go ahead, Larry.

5          MR. FRIEDMAN:  I'm sorry.

6          MR. GLYNN:  Go ahead, Larry.

7          MR. FRIEDMAN:  Before you table it, I understand what

8   you're saying, but I just want to say something.  It might be

9   helpful to note that there is a counsel of record who's entered

10   an appearance on behalf of Liberty, and that counsel is

11   Lawrence Glynn, Larry Glynn.  When he entered his appearance,

12   he said:  I represent Riviana and the interested subrogated

13   underwriters.

14          So he is counsel of record, and he just said that.  He

15   is counsel of record for Liberty because we know that Liberty

16   is one of the subrogated underwriters.

17          THE COURT:  Right.

18          MR. FRIEDMAN:  So whatever the Court's concerns are --

19          THE COURT:  He's also saying that he has no -- he's

20   also saying he has no contact with them and can't speak with

21   them directly.  So again --

22          MR. FRIEDMAN:  And if I may, if I may, Judge, we -- I

23   apologize, Judge, but we just learned that last week when he

24   submitted his response in the joint status report.  He never

25   said that starting in January when we served the notice.  He

1    never said that when he entered his appearance and said he was

2    representing them.  That is something we just learned for the

3    first time five days ago.

4          If that's going to delay things, that's unfortunate,

5    and I think, you know, we'd be prejudiced by that.  I

6    understand the Court's concerns.  I'm just hoping -- I'm trying

7    to hopefully alleviate those by saying he is, in fact, their

8    counsel of record and, therefore, they are getting notified.

9          If we have to wait for Mr. Appleyard to enter his

10   appearance, you know, we'll wait, but that just may delay

11   things further, and that would be, you know -- I understand

12   what this -- hopefully we can avoid that, but if we can't, we

13   can't.  But I just want to make sure that the Court was aware

14   of those factors.

15         THE COURT:  Okay.

16         MR. GLYNN:  Your Honor, Larry Glynn here.  Yes, the

17   relationship, again, we didn't believe it was something that

18   was necessary or that we were withholding anything.  This issue

19   has come up.  If it will help, I will file a formal notice of

20   appearance on behalf this Liberty entity.  Okay?  I have

21   authority to do that, and I will do that if that will make Your

22   Honor's life much easier, I hope.

23         I agree with Mr. Friedman that, yes, we do represent

24   Larry -- I'm sorry.  We represent Larry?  It's been a long day,

25   Your Honor.  I apologize.  I'm on trial right now.  We do

1    represent Liberty, and we are proceeding in good faith to

2    address the discovery.  I understand we're not getting to the

3    merits right now on this call.  We will file a notice of

4    appearance ASAP.

5            THE COURT:  Okay.  Okay.  Like I said, I -- okay.

6    Thank you.  I'm tabling the issue.  I'll circle back to that

7    once that appearance is on file and I do some more digging of

8    my own.  I appreciate the parties weighing in on this as it

9    stands right now.

10           Okay.  The other issue that --

11           MR. GLYNN:  You're welcome.

12           MR. FRIEDMAN:  You're welcome, Your Honor.

13           THE COURT:  Thank you.  The other issue is the

14   sufficiency of plaintiff counsel's ESI review.  So the Court

15   has reviewed the joint status report and, you know, I just want

16   to ask a few questions.  You know, Mr. Glynn, do you

17   continue -- do you maintain your position and swear and affirm

18   as you've indicated in the joint status report and you said

19   under penalty of perjury that you reviewed all the documents --

20           MR. GLYNN:  I do, Your Honor.

21           THE COURT:  -- and produced all responsive documents?

22           MR. GLYNN:  I do, Your Honor.

23           THE COURT:  Okay.  You know, my concern is frankly not

24   necessarily with Mr. Glynn's review.  It's that, you know, GXO

25   is saying that that they're concerned that Mr. Glynn could not

1    have reviewed that many documents in nine days, you know,

2    citing industry standards or averages of, you know, document

3    reviews.  But he's explained that some of the documents -- most

4    of them dealt with two different, unrelated casualties or were

5    certificates for insurance for other states.

6         So, you know, unless there is some evidence that you

7    have that there's clearly documents that have been withheld

8    that you believe to be and perhaps even know are in Riviana's

9    possession that have not been produced, I'll hear that.  But

10   short of, you know, a toehold of evidence that there are

11   documents that are responsive and being withheld other than

12   just that he couldn't have reviewed that many documents in that

13   time period, I'm inclined to not discredit the officer of the

14   court's affirmation.  So I'll hear from GXO on that issue.

15        MR. FRIEDMAN:  Thank you, Your Honor.  Well, first --

16   and again this is Larry Friedman -- you know, we'll take it at

17   face value what Mr. Glynn said about how fast he reviewed

18   things.  So he's saying:  I could review documents, some of

19   them, you know, multiple pages, and I could spend eight seconds

20   on a document and determine that it wasn't relevant.

21        Now there's no way to look through an entire document,

22   even if you accept the premise that some of these documents

23   discussed other casualties, but the same document may talk

24   about more than one.  It could have talked about Riviana, the

25   the Riviana issue as well as those others that came up.  He

1    just didn't have time to make that evaluation.

2              Why do we believe that that wasn't sufficient?  Well,

3    we do know back on February 18th, 2025, at ECF number 287,

4    before, when we were still talking about trying to narrow the

5    review set, Mr. Glynn said at that time there were many more.

6       (Unidentified speaker speaking on the record.)

7              MR. FRIEDMAN:  Can you still hear me, Your Honor?

8              THE COURT:  Yes.  Hold on one second.

9              MR. FRIEDMAN:  Okay.

10      (Discussion off the record.)

11             THE COURT:  Just hold on.

12      (Discussion off the record.)

13             THE COURT:  Okay.  Go ahead.

14             MR. FRIEDMAN:  So I was referring to an earlier joint

15   status report where we were talking about the fact that we were

16   still not getting enough information from them about, you know,

17   the searches and all that.  But in that document Mr. Glynn said

18   they've identified -- he used a number, but it was a much

19   larger number.  I think it was 80,000.  But he said:  I will

20   review those, and I will use or I will review them at a rate of

21   40 to 45 documents per hour -- which he described as, you know,

22   what would be necessary in order to meaningfully review them.

23   That's ECF 287 at page number -- page 5:

24             "Riviana will review the documents for relevance and

25   privilege."

1          Then he said:

2          "An experienced reviewer can review about 40 to 45

3     documents per hour."

4          So that's the right -- that's what Mr. Glynn said at

5     that time, and he was correct.  That's what's needed.

6          Now, Mr. Glynn, what he didn't do, he says, for

7     example:  I identified duplicates just by looking at them.

8          He didn't do any threading or deduping or analytics.

9     So he's saying:  When I'm spending eight seconds per document,

10    a document I may have looked at, you know, five days earlier

11    and now it's five days later, and going from my memory I

12    believe this is duplicative of another document.

13         It's just not realistic, Your Honor, and we know or we

14    further know by Mr. Glynn's own statement in the joint status

15    report that we filed on June 9th -- and that's document number

16    308 -- he acknowledged on page 10 and he said approximately 2

17    percent of the 18,166 documents were marginally related to this

18    litigation.  Then he said approximately 50 percent touched on

19    the issue of damages, so he's already -- he himself said there

20    are -- we don't know what "marginally related" means, but

21    that's at least 300 more documents that he decided, even though

22    he admitted they were relevant, he didn't produce.

23         So, you know, it's just not realistic and, you know,

24    as I said, looking at the actual search terms -- and we haven't

25    submitted this to the Court, but we can -- looking at the

1  actual hit report, there are searches which had more than -- he

2  produced 145 documents.  Those searches showed more than 145

3  hits on search terms that Mr. Glynn and Riviana agreed to which

4  could not have related to any other matter than this one,

5  because they include words like "Monee," the warehouse.

6       THE COURT:  They include words like what?  I didn't

7  hear that.  They include words like?

8       MR. FRIEDMAN:  Like "Monee," the name of the

9  warehouse.  Like "Monee," the term "Monee," M-o-n-e-e.  Excuse

10 me, Your Honor.

11      THE COURT:  Got it.

12      MR. FRIEDMAN:  M-o-n-e-e, that's the name of the

13 warehouse.

14      THE COURT:  Okay.

15      MR. FRIEDMAN:  And searches with those terms,

16 according to the hit report, there's more than 300 of those,

17 and there's other examples.  All of our search terms were

18 narrowly designed to only relate to this matter.  They include

19 "BIMC."  That was the surveyor.  As far as we know, that

20 surveyor only was hired for this engagement, for the Monee

21 warehouse.

22      Mr. Glynn mentioned two other matters.  There was a

23 hurricane, and there was a silo fire.  But none of the search

24 terms -- all of the search terms reference this matter and the

25 parties, the people only involved in this matter, and those

1   searches, according to the hit report, had more than 150.  They

2   had several hundred.

3          THE COURT:  Okay.

4          MR. FRIEDMAN:  So again, you know, Mr. Glynn, you

5   know, I think he was -- he didn't -- they didn't do the

6   standard things you'd expect them to do, like deduping,

7   threading, analytics.  It was just him going by his personal

8   memory, and it's just not realistic to say, you know, that that

9   alone, spending eight seconds per document, that he could

10  remember, you know, on day 8 something that he saw on day 5.

11         So given his own admission that there were what he

12  calls marginally related documents, we think at this point

13  because of the delays the best thing to do, as we said, is let

14  us look at them.  We'll pull out the things we think are

15  responsive, we'll destroy everything else, we'll let Mr. Glynn

16  see what those are, and there will be no prejudice to that.

17  There's no prejudice to them but, you know, it solves the

18  problem and it eliminates any further delays.

19         THE COURT:  So I will say you provided additional

20  information that was in the status report, particularly the

21  report that the search term "Monee" produced in and of itself

22  more than 300 documents and the fact that there were less than

23  that produced.

24         So, you know, the first thing I would do is I'll ask

25  Mr. Glynn about this.  What do you -- what's your response to

1    this notion that there's at least 300-plus documents out there

2    that have or that are specific to "Monee" and arguably some of

3    them were not produced --

4            MR. GLYNN:  Yes, Your Honor.

5            THE COURT:  -- because there was --

6            What is your response to that?

7            MR. GLYNN:  Sure, sure.  So "Monee" came up or the

8    majority of the times that "Monee" came up in these 18,166

9    documents that I personally reviewed was relating to scheduling

10   an initial meeting and then follow-up meetings at the Monee

11   warehouse.  Okay?  So we're talking about just literally

12   logistics, logistical plans for who's going to Monee, what date

13   the meeting is going to be.

14           What any of that has to do with the sole issue

15   remaining in this case, which has blown up to proportions that

16   I never contemplated nearly one year ago because it should

17   never have, what any of that has to do with damages as to,

18   well, what flight are you taking, this is literally what we

19   were -- what I personally saw were those types of documents and

20   emails:  I'll be there on this day.  I'll see you then.

21   So-and-so is coming to Monee, Monee, Monee warehouse.

22           It had nothing to do with damages, but I produced all

23   of them.  But why?  They had nothing to do with damages.  The

24   only issue remaining is damages.  I don't know what more I can

25   do than to say I went through these documents and quite

1  liberally pulled out documents that came close to talking to

2  damages, monetary damages.  If anything, I was overinclusive.

3      I'll use one example, Your Honor, just an example to

4  show what we're dealing with.  One particular email that I

5  pulled -- Mr. Friedman knows this and Ms. Manger knows this,

6  and I know she's listening -- was a document from somebody at

7  Riviana discussing how she was the best dressed person at the

8  inspection of the warehouse.

9      I'm not making this up, Your Honor.  This is what --

10  once I got past these handful of documents, 145 or so, that

11  legitimately touched on damages, I had to like really, really

12  go out of my way to find anything close to what's relevant to

13  this case.  I'm quite troubled that we're having this

14  discussion because it does call into question my efforts, my

15  advocacy, my veracity, and my truthfulness to this Court.

16      I worked on the World Trade Center litigation in 1995

17  and '96.  I (inaudible) the 87 World Trade Center warrants

18  where we looked through thousands and thousands of pages of

19  documents every day over the World Trade Center asbestos

20  litigation.  I got real, real good at reviewing documents

21  thoroughly and quickly.

22      MR. FRIEDMAN:  Your Honor, this is Larry Friedman.  If

23  I could respond to that, we don't need to get into -- we don't

24  need to get into ad hominem arguments about other litigation.

25  Here's what we do know.  Mr. Glynn himself back in February

1    said:  I'm going to review these at a rate of 40 to 50

2    documents per hour.

3             That's what he said in February.  We know now that

4    what he now says is:  Well, I reviewed --

5             THE COURT:  Well, he said an experienced reviewer can

6    review approximately 40 to 45 documents an hour.  You know, to

7    be frank, he didn't -- he didn't guaranty that that was going

8    to happen.  So let's not misread anything that people say.  I'm

9    looking at that report, too.  I mean, I don't think this says

10   anything other than -- I mean, frankly, I think this is

11   bolstering the -- I don't even know why that part is in there

12   anyway, more so to estimate how much this would cost.

13            But I don't -- what he said about a person's ability

14   to review documents then and what he did and what he's swearing

15   and affirming that he did, actually did, can be two different

16   things, and that's perfectly permitted.

17            MR. FRIEDMAN:  Well, Your Honor, what he said was --

18   I'm sorry, Judge.  What he said in February -- I don't want to

19   belabor this, and I understand what the Court is saying.  He

20   said, he said an experienced reviewer can review approximately

21   40 to 45 documents per hour and, therefore, Riviana estimates

22   that it will take approximately a thousand hours.  So he was

23   saying:  It's going to take us, Riviana, that many hours

24   because that's the rate we're going to use.

25            So he did say that's what they were going to do.

1    Again, I understand that that was in February and that here we

2    are now, but all we're saying is that it's just not realistic.

3    We'll take at face value that he said he spent these hours, but

4    he's saying:  I spent eight seconds per document, and I could

5    evaluate in eight seconds, including multipage documents.

6           How do you look through a multipage document in eight

7    seconds?  Maybe on the first page it talked about one of these

8    other incidents, but how do you know it didn't talk about this

9    incident and the damages on page 4?

10          THE COURT:  Right, but my point is --

11          MR. FRIEDMAN:  You just literally don't have time

12   to really --

13          THE COURT:  -- and my point has been from the

14   beginning you can't say the opposite.  You can't say:  I know

15   that I've seen documents where it talks about one casualty on

16   pages 1 through 4 but, lo and behold, on pages 4 through 8 it

17   talks about another casualty.

18          That's my point.  You haven't shown it.  I appreciate

19   there could be a lot of different scenarios that we could

20   create and think of for what could be, but I have someone

21   saying:  I swear and affirm, and I'm putting this on the record

22   and signing my name to -- well, I'm swearing or affirming under

23   penalty of perjury that this thing happened.

24          Then another side said:  Well, okay, but this could

25   have happened.

```
 1              That's what I said at the beginning.  You have to show
 2    some evidence to the contrary, that there is either a document
 3    that you know has been withheld or there's some other evidence
 4    that he is withholding or has withheld documents, and I haven't
 5    heard that.
 6              So okay.  I don't think I need to hear anything more
 7    on this issue.
 8              MR. GLYNN:  Thank you, Judge.
 9              THE COURT:  So I'll issue a ruling by mail, yes, a
10    ruling by mail on this particular issue as well as a minute
11    order on the issue with Liberty.  Okay.  Is there anything
12    further from plaintiff?
13              MR. GLYNN:  Oh, no, Your Honor.  Thank you very much.
14              THE COURT:  Anything further from defendant GXO?
15              MR. FRIEDMAN:  No, Your Honor.  Thank you.
16              THE COURT:  Okay.  Anything further?  The other party
17    on the line, Ms. Yong for Exeter, do you have anything to add?
18              MS. YONG:  No, Your Honor.  Nothing further.  Thank
19    you.
20              THE COURT:  Okay.  Thank you very much.
21              MR. GLYNN:  Thank you, Your Honor.
22              MR. APPLEYARD:  Thank you, Your Honor.
23              MR. FRIEDMAN:  Thank you.  Have a good day, everybody.
24       (Proceedings concluded at 5:43 p.m.)
25
```

C E R T I F I C A T E

I certify that the foregoing is an accurate transcript produced from an audio recording of the proceedings in the above-entitled matter.

*/s/Patrick J. Mullen*                    *June 25, 2025*
_____        _____
Patrick J. Mullen
Official Court Reporter